Stoddart agt. Key.

# SUPREME COURT.

JOSEPH M. STODDART, JR., agt. H. H. KEY and others.

*Contract— Law of place — Words " & Co.," when used by a person who has no partners—Illegal defense must be pleaded—Principal and agency— What amounts to an abandonment of agency — Rights of principal.*

The plaintiff, a resident of Philadelphia and a publisher of books at that place, under a firm name of "J. M. Stoddart & Co.," but having in fact no partner, entered into a contract under the name of "J. M. Stoddart & Co." with the defendant Key, at the city of Philadelphia, in respect to the canvassing for and selling by Key of the American reprint, of the "*Encyclopædia Britannica*," in the states of *New York and New Jersey.* Key was to report to Stoddart at Philadelphia, from which place all the supplies were to be ordered and forwarded:

*Held*, in an action brought in this state in favor of Stoddart against Key and others, founded upon the contract, that the contract was not void, under the statutes of New York, which forbids the carrying on of business by an individual in a firm name, or the use of the words "& Co." when it represents no actual partner (*Laws of N. Y.*, 1833, *chap.* 281). As a general rule the law of the state, when contracts purely personal are made, must govern as to their construction and validity, unless made in reference to the laws of another state in which they are to be performed.

When it is claimed that a contract is void because made in violation of the act forbidding the use of the words " & Co.," when they do not represent an actual partner, the illegality must be set up affirmatively as a defense, and if not pleaded it cannot be urged upon the trial, when the fact appears, as a ground for dismissing the complaint (*O'Zoole* agt. *Garvin*, 1 *Hun*, 92).

When an agent, under a contract regulating his services and compensation as a canvasser of books in process of publication, writes to his principal as follows: "I have determined to sell out and give up this business; if you want it, come or send on, and I will give you the figures which I will take; this is final:"

*Held*, that the principal was justified, after making a fair and reasonable proposition to settle, which was not accepted, and the good faith of the agent was reasonably suspected, under the facts and circumstances of the case, as stated in the opinion, in treating the defendant's action as an abandonment of the agency, and in at once appointing another person in his place, and that a sale of the list of subscribers, or an attempt to release them, made by Key thereafter, was invalid.

*Edward Patterson* and *Josiah R. Sypher*, for plaintiff.

*Burton N. Harrison*, for defendants Key and Hall.

*B. F. Dunning*, for defendants Scribner, Armstrong & Co. and Hall.

VAN VORST, *J.* — The contract of the 9th day of June, 1877, by the terms of which the defendant Key agreed, for the consideration therein expressed, to serve the plaintiff in canvassing for and selling the American reprint of the " Encyclopædia Britannica," was made in the state of Pennsylvania. Although the canvassing and selling under the contract was to be done by Key in the states of New York and New Jersey, yet he was to report to the plaintiff at Philadelphia, where the book was published, and from whence he was to receive his supplies.

By the agreement Key was to forward to the plaintiff, at Philadelphia, at the end of each week, the name and address of each subscriber secured by him during the previous week, and, as far as possible, the name and address was to be written on the " contract order " prepared and furnished by the plaintiff.

These orders were to be held by the plaintiff as collateral security so long as Key should faithfully fulfill the conditions of his contract, and in case of the non-continuance of the agency by Key, or his non-fulfillment of the conditions of the contract, the orders were to become the property of the plaintiff to the extent of Key's indebtedness to the plaintiff, the balance of Key's commission or earnings under the contract, after the payment of his debt, was to revert to him or his assigns.

After entering into the agreement Key proceeded to canvass for the work, and procured some one hundred and fifty subscribers, or thereabouts, to whom the work published by the plaintiff was delivered as the volumes were issued. The work was to run through twenty-one volumes. At the time the agency was abandoned by Key, as is hereinafter men-

tioned, six volumes had been published and delivered to subscribers.

The evidence shows that Key did not make, as he was required to do, regular and accurate reports of the names of all the subscribers.

The construction to be given to the letter of Key, written on the 31st day of January, 1878, to the plaintiff, based upon its language and his subsequent conduct, is that he, on that day, for all practical purposes, abandoned the contract and his agency thereunder.

Before that day he had heard of a new enterprise which was being formed under the direction of the defendant Hall, which opened to him hopes in another direction, and disturbed his loyalty to the plaintiff and his particular work. He had evidently lost faith in the plaintiff's success.

In this letter, Key alludes to this cheap English edition of the Encyclopædia which Mr. Hall, who had just returned from Europe, was about to put upon the market.

In concluding his letter he says:

" Since writing the above, I have determined to sell out and give up this business. If you want it, come or send on, and I will give you the figures which I will take. This is final."

At this time Key owed the plaintiff about $1,400 for books delivered to him under the contract for subscribers.

By the terms of the agreement he had an interest in the commission earned by him, subject to the payment thereout of the moneys due from him to the plaintiff. It must be considered that it was such resulting interest only which he could sell to any person other than the plantiff. For it cannot be supposed that he could sell the contract and substitute a third person in his place, to assume its burdens and reap its future advantages, without the plaintiff's concurrence.

The natural effect upon the plaintiff of such a notification as was contained in the defendant's letter of the thirty-first of January, would be to excite his apprehension and move him to prompt action.

The plaintiff had a large amount already invested in this enterprise, and Key's field of operation under the contract was important.

The notification contains a clear and unqualified expression of Key's abandonment of the business and of his final determination to sell out.  It contains an implication of a right to sell to others, for he says, if "you want it" come or send on and I will give you the figures.

There was no other course open to the plaintiff, under such circumstances, than to take the defendant at his word.  Any delay or hesitancy would only imperil the plaintiff's enterprise.

In reply to this letter the plaintiff immediately telegraphed the defendant that to "secure a settlement" he must come to Philadelphia without delay, and bring his record books and accounts.

On the second day of February the defendant went to Philadelphia; and in an interview with the plaintiff he said he was troubled about the business, had decided to give it up, and was going to South America.  He said he wanted to be paid for the orders he had obtained, and would sell out his interest for fifteen per cent of the prospective value of the volumes yet to be delivered.

The plaintiff at once accepted the defendant's offer, and said he would pay him the fifteen per cent demanded, but would require the orders to be proved by the delivery of one volume on each order.

This requisition, which must be considered as reasonable, the defendant refused.  He said he wished to be settled with and immediately receive his money.

Plaintiff stated that in that way he might be paying for something that did not exist, but would adjust the matter in the way he mentioned.  No such result being reached, the plaintiff said his business in New York must be protected, and that he would at once procure some other person to attend to it.

To this the defendant objected, saying that the plaintiff

should do nothing towards carrying on his business until he had settled with him.

Plaintiff at once appointed a person in New York to attend to his affairs. Key gave no further attention to his duties under the contract, but did enter into arrangements with Hall, the effect of which, if successful, will prove destructive to the plaintiff's rights under the contract and injurious to his enterprise in general.

The subsequent action of Key clearly enough shows that he entertained no idea of going to South America, and that it was simply assigned as a plausible reason for abandoning his contract with plaintiff. His action afterwards shows that it was his then intention to enter into the service of Hall, and under him circulate the rival edition of the Encyclopædia, to the exclusion of the plaintiff's work. This secret purpose led him without doubt to reject the plaintiff's reasonable request to test the accuracy of his orders by the delivery of one volume of the work, as a basis of fixing the fifteen per cent upon future deliveries.

That it was the purpose of the defendant Hall to injure the plaintiff's enterprise appears by the evidence of Alvin J. Johnson, which is not contradicted. Hall said to Johnson: "We will get all the plaintiff's canvassers, and we will get all their subscriptions, and they can never finish the work." Having made some arrangements with Hall, the defendant, assuming to act as the agent of the plaintiff, during the month of February called upon several of the subscribers to the plaintiff's work, and in writing released them, or assumed to do so, from their obligation to receive the remainder of the volumes, and he agreed to take from them such of the volumes as they had already received under their subscriptions, and exchange for them volume for volume of the English edition, and to deliver to them the remaining volumes of that edition. Key, afterwards aided by Hall, carried out that arrangement with several persons. Several of the subscribers to plaintiff's book, who were induced to make such change,

were informed by Key in substance that the plaintiffs were not able to complete the publication of their work through a want of necessary funds.

To at least two persons defendant Key stated that he had sold the list of subscribers which he had obtained for plaintiff's work to the defendant Hall, or to the defendents Scribner, Armstrong & Co., for a pecuniary consideration. Hall's substantial relation to this controversy may be shortly stated. He had originally, and in the fall of the year 1877, some arrangements with the house of Little & Brown, of Boston, the importers of an English edition of the Encyclopædia, by which he would circulate the work in this country. Hall had some special relation to the house of Scribner, Armstrong & Co., in connection with the circulation by subscription of some books they were publishing. He was so connected with Bryant's "History of the United States" and a work on birds. They had no connection with Hall's work on the English Encyclopædia other than as guarantors that he would pay for such books as he might receive from Little & Brown.

In the end and about the month of April, 1878, and after the commencement of this suit, by an arrangement they made with the English publishers abroad, they became the importers of the book instead of Little & Brown, and are now the receivers of the same in this country.

At the times, however, during which the matters in controversy herein arose, they had no actual interest in the work. It was Hall's individual concern, and what he did with Key was on his own responsibility and in his own interest.

But having become responsible through their guarantee to Little & Brown for the delivery to Hall, Scribner, Armstrong & Co. preferred in the end to receive the books themselves. And with reference to such contingency and the readjustment of their own copartnership, which had become dissolved through the death of one of its members, an arrangement was proposed to be made in the future for its circulation through Hall. But the evidence is not clear whether any such arrange-

ment has been in fact made, as the contemplated copartnership, according to the testimony of Mr. Armstrong, was never formed.

But the present house of Scribner, Armstrong & Co. do import and circulate the English edition, and have so done since April, 1878.

Mr. Armstrong, formerly in the firm, and who continued therein until June, 1878, had the management it would seem of the details of this business, and made upon the trial a statement in respect to the attitude of his house with respect to the book and the defendant Hall. His firm knew nothing of the list of subscribers obtained by Key for the plaintiff's book, nor of his engagements with plaintiff. They never purchased from him his list of subscribers and had no connection therewith.

And although in the end they employed Key to canvass for their edition of the work, they refused to allow an exchange of their books for the plaintiff's books.

I find nothing in the evidence which involves any member of the firm of Scribner, Armstrong & Co. in any of the acts of Key or Hall injurious to the plaintiff, or any adoption of his arrangements with Key. It is true Hall was in their service and was engaged in the circulation of special works, and in the end was connected with the English edition of the Encyclopædia, after they obtained the control. But the interest of Scribner, Armstrong & Co. in the work did not arise until after the commencement of this action.

But such equitable relief as the facts justify should be awarded to plaintiff.

Any attempt on the part of Key to sell or dispose of the lists of subscribers to Hall or any other person, under the facts of this case, was wholly without justification, right or power. Indebted as he was to the plaintiff, and having abandoned the service in which he was engaged, he could not, by the terms of the agreement, make any disposition of the orders obtained. In such contingencies the orders and lists belonged to plaintiff, subject to the payment, out of the moneys realized as

commission or compensation for subscribers obtained by him, the amount of plaintiff's claim against him.

Under the circumstances he had no power to execute releases to the subscribers of their engagements to take the remainder of the volumes. I am not certain, however, that the releases can here be set aside. The parties taking them are not before the court, and they probably acted in good faith, not doubting the power of Key to discharge them, and perhaps had no notice of the termination of his agency. I infer that to be the case with reference to such of the subscribers as were examined as witnesses. But it is not necessary to pass upon that question. In so far as a judgment can be made to protect the plaintiff against the action of Key and Hall, equity requires that it should be done.

But before determining the special relief to which plaintiff is entitled, it becomes necessary to examine a question which has been presented by the counsel of all the defendants.

This objection is founded upon the fact, which clearly appears in the case, that the plaintiff was carrying on business in a firm name. He, as an individual, transacted business and entered into the contract with Key under the name of " J. M. Stoddart & Co." The term " & Co.," which follows plaintiff's name in the contract and signature thereto, represented no actual partner in his business.

This is claimed to be a violation of the laws of this state, and it is insisted by the learned counsel for the defendants that this contract cannot form a basis of an action for equitable relief here (*Laws of New York of* 1833, *chap.* 281). Should we unqualifiedly accept the defendant's contention, that in so far as the performance of the contract within the state of New York was concerned it would involve a transgression of our law, yet in no event would that condemn the contract wholly or justify the defendant's action. The contract was designed to be performed in New Jersey and Pennsylvania, as well as New York. There was a considerable territory in New Jersey over which the defendant's agency extended.

But the contract was not made in New York. There is no room for the suggestion that this contract was made with any design to violate our law, or that it was made otherwise than in the ordinary course of the plaintiff's business in the state in which he lived, from whence the book on which he was engaged was ,to be forwarded, and to which the defendant was to make his reports and returns as agent. In a true sense the plaintiff's business was not conducted in New York, but in Pennsylvania.

There is nothing to show that there was any illegality in the contract by the laws of the state where it was made, and the presumption is that it was entirely valid there.

Should a question ever arise between a subscriber to the work in New York and the plaintiff as to the validity of a subscription or order made with the plaintiff under the name, J. M. Stoddart & Co., it would be limited to such controversy.

I do not think the defendant should be allowed to anticipate or raise such question here for the purpose of avoiding his engagements with the plaintiff, or to justify his appropriating to himself all the advantages that the plaintiff had gained by the partial performance of the contract through the defendant's agency.

The learned counsel for the defendant has, in an elaborate and carefully prepared brief, presented the question of the illegality of this contract, and has cited numerous authorities to fortify the ground taken by him that the contract is wholly void, and can furnish no ground for equitable redress in this jurisdiction.

In *Pomeroy* agt. *Ainsworth* (22 *Barb.*, 118, 127), PAIGE, J., formulates the subject in this wise: "As a general rule the law of the place where contracts purely personal are made, must govern as to their construction and validity, unless they are to be performed in another state or country, and were *made in reference to the laws of such state or country*, in which case their construction and validity depend upon the law of the place of performance."

This I take to be a correct expression of the law on that branch of this subject.

But should all that is contended for by the defendant's counsel in regard to the inherent invalidity of this contract be conceded, I do not think it should avail the defendants in this action. Nor would he be wholly absolved from responsibility.

He did not originally place his withdrawal from the contract upon any such ground. He assigned totally different reasons for his contemplated action.

Nor have the defendants, or either of them, interposed by answer any such defense, but, on the other hand, the answer of the principal defendant, Key, sets up that the name "J. M. Stoddart & Co." represents a firm composed of several persons.

In *O'Toole* agt. *Garvin* (1 *Hun*, 92), DANIELS, J., in substance says that this illegality is a ground of defense, and must be affirmatively set up. In that case the illegality of the contract made its appearance during the trial, and for that reason the plaintiff's complaint was dismissed, but the judgment was reversed.

The fact "must be alleged as well as proven." I think the rule laid down in that case should apply here, and that the defendants' application to dismiss the complaint upon the ground that the claimed illegality appeared during the trial, and even in the plaintiff's case, should be denied, and that the plaintiff should have in substance relief against the defendants to the following effect:

As against the defendant Key, that he be ordered and required to deliver to the plaintiff a full list of all the subscribers within the territory mentioned in the agreement to the American reprint of the "Encyclopædia Britannica" at the date of his resignation, January 31, 1878.

That Key be required to account for all copies of the book received by him from the plaintiff.

That he be enjoined and restrained from acting or claiming to act in any manner as agent of the plaintiff or of plaintiff's publication, and from interfering with the sub-

scription lists to said publication, and from attempting to discharge any subscriber from his subscription thereto, and from inducing such subscribers to change their subscriptions therefrom to the Edinburgh or any other edition of said Encyclopædia.

And as against the defendant Hall, that he be perpetually enjoined and restrained from acting in concert with Key or otherwise in diverting the subscriptions in Key's possession from plaintiff's publication to the Edinburgh edition; that he be ordered and required to restore to plaintiff any subscription list of the plaintiff's publication which may have been delivered to him by Key, and that he be restrained from interfering in any manner with the plaintiff's business in procuring subscriptions to his publication and in delivering volumes of plaintiff's edition to the subscribers thereto ; that he be also restrained from delivering by himself or others any volumes of such Edinburgh publication to the subscribers of plaintiff's publication upon any cancellation or change of subscription made by Key or through his agency.

As to the defendants Scribner, Armstrong & Co., they are not shown in any manner to be chargeable with or implicated in Key's conduct towards the plaintiff or the subscribers to his book. They never, through Hall or otherwise, authorized any exchange of the edition of the Encyclopædia which they controlled, with subscribers obtained by Key, and whose orders he attempted to cancel.

But, on the other hand, they refused to allow any exchange of their book for the plaintiff's book. But as such exchanges may be made through the agency of Hall in the subscription department of their house, upon subscriptions to plaintiff's book canceled by Key, they must not suffer it to be done.

In this view, although the complaint may not be absolutely dismissed against the latter defendants, they are not chargeable with costs in this action. But the relief above granted as to the defendants Key and Hall subjects them to the payment of the costs of this action.